## VALIDITY OF AGREEMENT GIVING SOLE VOTING RIGHTS TO ONE CLASS OF STOCKHOLDERS.

### Superior Court of Cincinnati.

### LAURA A. KRELL V. THE KRELL PIANO COMPANY.*

### Decided, March 29, 1920.

*Corporations—Sales of Property and Assets of—Agreements Between Stockholders Not a Matter of Public Concern—Where Not Against Public Policy—Voting Rights Subject to Such Agreements.*

1. A sale of corporate property does not constitute a sale of the company's "entire property and assets" within contemplation of Sections 8710-12, where book accounts, notes and leases of an aggregate value of more than $200,000 are not included.
2. Where the articles of incorporation contain a stipulation that in the event there occurs a default of payment of six or more semi-annual preferred dividends, then the preferred stockholders shall have the *sole* and *exclusive right to vote,* such stipulation in law is a valid binding contract between the stockholders and upon such default the common stockholders are excluded from voting.

*Theodore Horstman,* for plaintiff.
*Ernst, Cassatt & Cottle,* for defendant.

GUSWEILER, J.

This an action by some of the stockholders of the defendant company to have this court declare void a sale of certain property and assets of defendant company made by the defendant company on or about August 27th, 1917.

The issues are to be found in the second amended petition, the answer thereto and the reply to the answer. . Stated briefly the plaintiffs allege two causes of action.

First. That the sale in question was a sale by the corporation of "its entire property and assets" within the meaning of G. C. Section 8710 *et seq.;* that as such it required the approval of a three-fourths vote at a stockholders' meeting, as provided in

*Affirmed by the Court of Appeals.

Section 8712; that at the stockholders' meeting at which the approval was given in this case, the common stockholders were excluded from voting and that the sale was not therefore in accordance with the statute.

Second. The second cause of action alleges that a named individual was the owner of a majority of the preferred stock of the defendant company and that a majority of the board of directors of the company were under his domination and control; that by virtue of his control of the board and his ownership of a majority of the preferred stock, he caused the directors' and the stockholders' meetings to approve a sale of the entire assets of the defendant company to another company, of which he was the principal owner, at a price far below the real value of such assets.

As to the first issue the evidence shows that the sale to the other company did not include the cash, notes, accounts, bills receivable and certain real estate valued at $300 in Cheboygan county, Michigan. The notes, accounts and bills receivable included amounts due to the company on open account, notes secured and unsecured, and piano leases, under which the defendant company had leased pianos to customers, said pianos to become the property of the customers upon final payment in installments. The latter item amounted to over $150,000; the total of all the items, not including cash, amounted to over $200,000.

We conclude that a sale of the property of the defendant company which excluded assets of that character and amount, was not a sale of the "entire property and assets" of the corporation and that Section 8710 et seq. of the General Code of Ohio do not apply. The evidence in the instant case does, however, disclose that this sale practically terminated the company's customary operations as a manufacturing concern.

However, if we concede that this sale was a sale of the "entire property and assets" of the corporation, we find that the requirements of Sections 8710 to 8712 inclusive were fully complied with.

The evidence shows that the agreement for the sale was authorized by three-fourths of the directors as required by Section

8710; it was submitted to a meeting of which due notice had been given to each of the persons in whose names the stock of the corporation stood on its books, and by due notice published in the newspapers, as required by Section 8711.

The agreement of sale was considered and a vote by ballot taken for its adoption or rejection, and the agreement was approved by three-fourths of all the votes cast at the meeting *by stockholders who were entitled to vote.*

*The preferred stockholders had the exclusive voting power in the corporation at the time of this transaction.*

The articles of incorporation of the defendant company contain the following language:

"Said preferred stock  *  *  *  shall not be entitled to any voting power at the annual or other meetings of the stockholders of said corporation unless default shall have been made by it in the payment of six, or more, of said semi-annual preferred dividends, in which event the holders of said preferred stock shall have *sole voting right,* to the *exclusion* of the holders of its common stock."

It is not denied that at the time of the sale in August, 1917, there had been a default in the payment of more than six semi-annual preferred dividends. The preferred stockholders thereupon became entitled to the *"sole voting rights, to the exclusion of the holders of its common stock."*

This provision in the articles of incorporation was authorized not only by General Code, Section 8669 (107 O. L. 411), which expressly authorizes "preferences and voting powers or restrictions or qualifications thereof in the certificate of incorporation," but it was also valid and binding under the laws of Ohio prior to and without such statute.

Any restriction or deprivation of voting power is a matter of *contract between the stockholders,* binding upon them and in which the public has no concern.

In *Miller* v. *Ratterman,* 47 O. S. 141, the 3rd syllabus is as follows:

"The ownership of stock in an incorporated company, as a general rule, carries with it the right to vote upon the same at

any meeting of the holders of the capital stock. But to this rule there may be exceptions; and it is competent for a railroad company, in issuing certifiicates of preferred stock, to stipulate therein that the holders shall not have or exercise the right to vote the same, or as owners of the same, at any meeting of the holders of the capital stock of the company.''

The court say on page 158:

''In any view, it is fair to treat the proviso as but an arrangement between two classes of stockholders which did not concern the public. It is true that one characteristic of stock generally is that it can be voted upon. But this is not essential. Indeed, instances may arise where it is good policy to prohibit the voting upon stock.''

At the time of this decision of the Supreme Court there was no statute authorizing the exclusion of any class of stockholders from their right to vote under any circumstances. On the contrary, the statute provided (R. S. 3245 Smith & Benedict) with reference to the election of directors ''each share shall entitle the owner to as many votes as there are directors to be elected,'' yet the Supreme Court held that in spite of this statute the stockholders might agree among themselves to the exclusion of one class of stockholders from the right to vote.

When the provisions of the articles of incorporation give the preferred stockholders the ''sole voting rights to the exclusion of the holders of the common stock,'' this applies to the voting rights given under G. C. Section 8712 as well as any others. Section 8712 is as follows:

''At such meeting of stockholders, the agreement of the directors shall be considered and a vote by ballot taken for its adoption or rejections. For each share of stock on which all the installments called for by the board of directors are paid, the holder thereof shall be entitled to one vote. The ballots must be cast in person or by proxy, and if three-fourths of all the votes cast at the meeting be for the adoption of the agreement, it shall be valid and binding on such corporation. Upon its adoption the officers of the company shall execute and deliver to the purchaser good and sufficient deeds and transfers of all the property and

assets of the corporation, upon the terms and conditions in the agreement provided.''

It should be observed that the thing called for by Section 8712 is not the consent of stockholders in writing or otherwise. The thing called for is a meeting of the stockholders at which the agreement shall be *voted* upon.   The power exercised by the stockholders under this section is. a ''voting power'' within the meaning of the articles of incorporation.   It is immaterial that the statute provides that the holder of ''each share of stock on which all installments called for by the board of directors are paid'' shall be entitled to one vote.   *That is merely a regulation to be applied to those stockholders who have voting rights.*   It would supersede the provision of Section 8636, allowing a vote for each share owned and substitute therefor a limited franchise, viz a vote for each share on which all installments were paid.

The voting right conferred by Section 8712 is no more sacred than that conferred by Section 8636, which gives each stockholder the right to vote for directors the ''number of shares owned by him,'' and no one would question that such a provision as that found in the articles of incorporation of this company effectually deprives the common stockholder, on the contingency named, of the power to vote for directors.

Section 8712 does no more than state in a general way the conduct of a stockholders' meeting for the consideration of a contract of sale, and states in an equally general way, the voting rights of the stockholders thereat and it does not over-ride any *agreement between the stockholders* evidenced in the articles of incorporation and in the stock certificates authorized by General Code Section 8669, and also by the law of Ohio prior to and without such a statute, excluding either preferred or common stockholders from the right to vote.

If it be said that a stockholder ought to have the right to vote on the sale of the entire corporate property, especialy for the securities of another company, the answer is that so ought he to have the right to a vote in the election of directors.   His in-

vestment is as likely to be wrecked by bad management as by an improvident sale. He may just as naturally rely upon the other class of stockholders and the directors for a proper sale of the assets of the company as he may rely upon them for the proper management of its affairs.

In either event the right is not so sacred that it can not be contracted away by the provisions in the articles of incorporation and in the stock certificates.

In *State, ex rel Frank,* v. *Swanger,* 190 Mo. 561, 89 S. W. 872, 2 L. R. A. N. S. 121, the syllabus is as follows:

"Preferred stock of a corporation may be made non voting under a statute giving the incorporators power to issue such stock and fix the preferences, priorities, classification and character thereof, although the constitution and statutes provide that in all corporate elections each shareholder shall have a right to cast as many votes in the aggregate as shall equal the number of shares held by him."

This was an action in mandamus to compel Secretary of State to issue certificate of incorporation to the X Company. His defense was that the articles provided that voting power vested exclusively in common stock, which he contended is in violation of constitution of Missouri providing that in all elections for directors each shareholder is to have as many votes as he owns shares; also other provisions of constitution as to increase of indebtedness with consent of stockholders, issuance of preferred stock with consent of stockholders and that all shares shall be voted by the person in whose name they stand, etc. Also (defendant contended), the Missouri statute provided that in elections for directors each shareholder is entitled to as many votes as he has shares.

The court cites and quotes Cook, Corp. 5th Ed. Section 622b (7th ed. vol. 2, Section 622b, p. 1843) as follows:

"There is no rule of public policy which forbids a corporation and its stockholders from making any contract they please in regard to restrictions on the voting power."

The court also cites and quotes from *In re Barrow etc. Steel Co.*, L. R., 39 Ch. Div. 582 (1888) at page 603, as follows:

"Again it is said to be unfair that the preference shareholders should be affected by the passing of resolutions (to reduce the capital stock) by the votes of ordinary members of the company; the preference shareholders themselves being excluded by *contract* from any power of voting. I think the answer is that it is by *contract* that they are excluded. It is a part of the *bargain with them.* They were content to take their shares subject to the regulations of the company, although they knew that those *regulations* might be altered by the votes of persons whose votes they could not influence—at any rate directly—by taking part in the voting themselves.

The Attorney General of Ohio in an opinion to the Secretary of State under date of March 1, 1919, (Department Reports March 20, 1919, page 703) held that the articles of incorporation of the Dixie Terminal Company, giving to the preferred stockholders the exclusive right to elect the directors of the company on the contingencies set forth in the articles, was valid and binding.

The opinion was not based on the narrow ground that the preferred stockholders were excluded only from the right to elect directors, but on the broad ground that in the absence of a direct prohibition in the statute, the common and preferred stockholders might *agree among themselves,* through the medium of the articles of incorporation and stock certificate, as to the exclusion of either from the voting power.

The Attorney General says (704) :

"It would seem, however, that if we start, as we must do, with the general rule that both classes have equal voting power unless taken away or abridged by some constitutional or statutory provision, and if it is competent, as it had been held time and again by the courts, to give the common stockholders the exclusive voting power, it would be equally valid to confer such exclusive right upon the holders of the preferred stock. The authorities sustaining provisions restricting the voting power of the preferred stockholders are to the effect that such arrange-

ments are generally matters of private concern to the stockholders only and proper subjects of agreement between themselves. By so contracting, the stockholders do not violate any rule of common law, and if either class, common or preferred, voluntarily agrees to such limitations upon their common right, such agreement can not be said to violate any settled rule of public policy.''

1 Machen, Corporations, Section 570:

''The right of shareholders to vote is, however, like the right to dividends or to participate equaly in a division of capital in liquidation, regarded as a private matter for each shareholder which he may waive if he choose. Consequently, a provision that shareholders of a certain class shall have no right to vote is, if assented to by them, quite valid. Such a provision might theoretically be made as to either the preferred or the deferred shares, but is much more common with respect to the preferred shares so as to compensate the other shareholders for the preference of the preferred shareholders as to dividends. A provision in an incorporation paper, whereby the preferred shareholders shall have no right to vote is, therefore, valid even though a statute provides that every stockholder shall be entitled to one vote for every share held by him.''

3 Clark & Marshall, Corporations, p. 1996:

''A stockholder has no right to vote at corporate meetings, whether the stock is common or preferred, if it is so stipulated when the stock is issued, for the stipulation is then a term of his contract. And even after persons have become stockholders, they may surrender or restrict their power to vote by agreement— by consenting to by-laws or otherwise—provided the agreement does not violate and charter or statutory provision, and is not contrary to public policy.'' etc.

In 7 Ruling Case Law, p. 345, the law is stated as follows:

''A provision in articles of incorporation that the voting power shall be vested exclusively in the common stock and that preferred stockholders shall have no right to vote has been held not to be violative of any rule of the common law or of public policy. * * * Preferred stockholders may also be given the *sole right* to vote, to the *exclusion* of the holders of the common stock.''

2 Clark & Marshall, Corportions, p. 1320:

"In the absence of charter or statutory provisions or valid stipulation to the contrary, holders of preferred stock have the same right as holders of common stock to vote at stockholders' meetings.  And their *contract* may even give them the right to vote to the *exclusion,* for a time, of the holders of common stock, so as to place the management of the corporation entirely in their hands for the time specified."

1 Thompson, Corporations, Section 859:

"The rule that a right to vote follows the ownership of stock means that in the absence of any common restriction upon all stock, or upon a class of stock, this right prevails.  That is, the right of a stockholder to vote can not be arbitrarily abridged and is not subject to unreasonable restriction.  But the rule is equally emphatic, if not so general, that restrictions may be placed upon the right to vote; or, as sometimes stated, the right to vote may be separated from the ownership of stock.  It must be remembered, in this connection, that stockholders can make *any agreement r*especting their stock, or the *voting* of it, that they may see fit or deem wise, except agreements that are void as against public policy.  *  *  *  It is simply a contract relation between the two classes of stockholders, in which the public has no concern."

4 Thompson, Corporations, Section 3605:

"The whole matter is one of *contract* or of statutory regulation, and it would not be improper, where there is no statutory or charter prohibition, to confer the sole right to vote upon the *preferred* stockholders to the *exclusion* of the holders of the common stock."

The provision in Section 8712 relating to such meetings as that here under consideration, that "for each share of stock on which all the installments called for by the board of directors are paid, the holders thereof shall be entitled to one vote" is not a prohibition of any agreement between the stockhoders to the contrary, namely, an agreement giving the sole voting rights to the preferred stockholders.

As we have seen, the Supreme Court of Ohio held in the case

of *Miller* v. *Ratterman,* that the preferred stockholders might be deprived of the right to vote, even though the statute at that time expressly provided that in the election of directors ''each share shall entitle the owner to as many votes as there are directors to be elected.'' In other words, Section 8712 simply related to the voting rights of the stockholders in the absence of an agreement to the contrary.

It is contended that Section 8712 was passed after Section 8669, which authorizes the corporation to create restrictions or qualifications of the voting powers, and that therefore it amends or limits Section 8669.

This does not follow because the later statute is not, as a matter of fact, inconsistent with the earlier one, Section 8712, providing for the voting at a meeting where a sale of the entire assets of a corporation is being considered, is like Section 8636, which provides for the election of directors, subject to the provisions of Section 8669 and to the law of Ohio before and without such Section 8669, which authorizes agreements among the stockholders, embodied in the articles of incorporation or otherwise, excluding one or the other class from the right to vote.

If the Legislature had intended to prohibit the exclusion of common or preferred stockholders from the right to vote under Section 8712, it would have said so, as it did recently in Section 8698 (as amended March 30, 1917; 107 O. L. on p. 415).

In the section just referred to, which relates to meetings called for the purpose of increasing the stock, issuing preferred stock, etc., the Legislature uses the following language:

''For the purposes of this section restrictions or limitations on the voting power of any of the authorized capital stock shall not apply.''

This section provides for increase of capital stock, in effect it grants a franchise, a right from the state, and therefore the state is directly interested and would naturally prescribe the terms and procedure without reference to the contractual relations of the stockholders. In doing so, the state provided, in

G. C. 8698, that "for the purposes of this Section, restrictions or limitations on the voting powers of any of the authorized capital stock shall not apply;" in other words, that the amount of stock which must agree to the increase is to include all stock without reference to limitations upon the voting power; otherwise the state will not grant authority to increase the stock.

The Legislature having its attention called to the restrictions and limitations on voting power of stock, provided only in this Act of March 30th, 1917, that they should be disregarded in proceedings under that act. It limited such provision to 'the purposes of this Section," viz., the increase of stock. If it had intended those restrictions to be disregarded in proceedings under Section 8712 it would have said so. *Expressio unius est exclusio alterius.*

In the case of *State* v. *Gilbert,* 75 O. S. 1, 47, the court said at page 47:

"The familiar maxim of interpretation, *expressio unius est exclusio alterius,* applies here; for logically the express grant of certain powers and silence as to others is necessarily a withholding of those not named."

In *Richards* v. *Market Exchange Bank Co.,* 81 O. S. 348, the 2nd syllabus is as follows:

"Section 3175j, Revised Statutes, relating to the discharge of negotiable instruments, provides in what manner, and for what causes, such instruments may be discharged, and, by force of the rule *expressio unuius est exclusio alterius,* sureties upon such instruments who are primarily liable thereon can not be otherwise relieved from responsibility for their payment."

So, in the case at bar, the expression of the Legislature that restrictions on voting power of stock should be disregarded in the matter of the increase of stock, implies that without such expressed provision by the Legislature they would not have been disregarded, and further implies that in all other matters they are not to be disregarded.

If it be suggested that the increase of stock is a matter of less

importance than a sale under Section 8712, the answer is that the Legislature has said with respect to one that the limitations and restrictions on the voting power of different classes of stock shall be ignored, and with respect to the other has made no such declaration. It is not for the courts to add a limitation where none is provided by the Ltgislature.

It is clear, therefore, that by contract, with or without the statute, the common stockholders were lawfully deprived, on the contingency which had happened in this case, of the power to vote.

While, of course, their interest in the corporate property could not be taken from them, or their rights therein impaired, they could have nothing to do with the management of the company and in any matter upon which they would ordinarily have the right to vote they no longer had that right.

The common and preferred stockholders in the case at bar, at least during the contingency of failure of dividend payments, were bound by the contractual conditions contained in the company's articles of incorporation, in their acceptance of stock in said corporation. The conditions were not illegal or improper and by the terms thereof on the default of the company to pay its semi-annual preferred dividends for six periods the holders of the preferred stock obtained the sole and exclusive right to vote at all stockholders meetings. The whole matter was one of contract, was reasonable and fair and on the happening of the contingency conferred upon the preferred stockholders the sole right to vote to the exclusion of the holders of common stock. In law the common stockholders are presumed to have known of this limitation upon their right to vote when the common stock was accepted, and they may make any agreement respecting their stock or the voting of it, that they may see fit or deem wise, except agreements that are void as against public policy, such is simply a contract relation between the two classes of stockholders, in which the public has no concern.

As to the second issue we find that the action that was taken by the board of directors and by a majority of the stockholders

of the defendant company who had the right to vote can not be successfully attacked by dissenting stockholders except upon substantial proof of bad faith.

Clark and Marshall on Corporations:

Section 554.  Discretionary powers of directors or majority of the stockholders.

(a)  In general—The doctrine that a stockholder may sue in equity to redress or prevent wrongs on the part of the directors or majority of the stockholders, or to obtain redress on behalf of the corporation for injuries by strangers, where he can not obtain relief through the corporation, does not give a stockholder the right to maintain such a bill where the act complained of, or the refusal of the directors or majority of the stockholders to sue, is properly within the discretionary power with respect to the internal affairs of the corporation vested in them by the charter.  So long as they act, not fraudulently, illegally, or oppressively, but in good faith, in the exercise of their discretion, and for what they deem to be the best interests of the company, a court of equity has no jurisdiction to interfere at the suit of a dissenting stockholder, or a dissenting minority of the stockholders.  Such a suit can not be maintained by showing a mere mistake or error of judgment on the part of the directors or majority of the stockholders.  Their conduct must be *ultra vires*, illegal, fraudulent, or oppressive.''

A majority stockholder of a corporation does not occupy any confidential or trust relation to the corporation or the other stockholders in the matter.

It is contended that majority stockholders occupy a relation to the other stockholders requiring them to exercise good faith, etc.  Of course this proposition is not denied, but we fail to find clear and convincing evidence of bad faith in this case.  No presumption of bad faith arises from the fact that a majority stockholder, as such, votes at a stockholders' meeting in favor of a sale to another corporation in which he is interested.  We have carefully considered all the evidence of what occurred between the parties at the time of this sale—the financial condition of the defendant company at that time and for a long time prior thereto—and are forced to the conclusion that the directors were

doubtless compelled and constrained to do the very thing they did to prevent bankruptcy results or a forced public sale. If the assets had been sold in bankruptcy or public sale we are sanguine that the stockholders and directors complained of could have purchased them at a much better advantage to themselves than could possibly obtain in the present sale. Under all the circumstances the company's interests by this sale were more advantageously secured than could have been possible in bankruptcy. We are not convinced or satisfied by conclusive proof or by a preponderance of the proof that the directors and officers of the defendant company acted fraudulently and in bad faith in the matter of this sale.

The directors made the sale to the other company presumably in the exercise of their best judgment and it is not open to attack on the ground of inadequacy of price; that was a matter for the directors to determine and is not open to review by a court of equity without a clear showing of fraud or bad faith.

It follows and we find that the prayer of plaintiff must be denied and the cause of action dismissed.

---

### DEFENSE OF INSURANCE COVERING THE DAMAGE SUSTAINED.